JAMES ALBRECHT

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

1. STATUTE—*liquor law of* 1874 *a penal statute, and to be strictly construed.* The statute of 1874, relating to dram shops and intoxicating liquors, is a penal statute in its provisions, and is to be construed strictly, keeping in view the great central object in its enactment, and the evils to be prevented.

2. INTOXICATING LIQUORS—*act of* 1874 *aimed at dram shops.* Every section of the statute of 1874, the title of which is "Dram Shops," is aimed at such as keep a dram shop, not, however, with a view to their suppression; and the provisions of the sixth section do not apply to a person who treats a friend at his private house, as an act of hospitality.

3. In this case, the defendant was a brewer, engaged in the manufacture of beer, not to be sold and drank on the premises, but for sale by the quantity, and being unwell, and confined to his house, on some persons calling to see him on business, he sent for a pitcher of beer, and invited all to drink, and one of the parties did drink, whom it was alleged was intoxicated: *Held,* that the case was not the one contemplated by the sixth section of the act of 1874, and no conviction could rightfully be had against him.

WRIT OF ERROR to the Circuit Court of Bureau county; the Hon. EDWIN S. LELAND, Judge, presiding.

Mr. G. GILBERT GIBBONS, for the plaintiff in error.

Mr. JAMES K. EDSALL, Attorney General, for the People.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a prosecution, by indictment, in the circuit court of Bureau county, against Jacob Albrecht, for an alleged violation of chap. 43, title "Dram Shops," R. S. 1874, p. 438.

The title of the act, in full, is, "An act to provide for the licensing of and against the evils arising from the sale of intoxicating liquors."

The sixth section of this act provides as follows: "Whoever, by himself or his agent or servant, shall sell or give

intoxicating liquor to any minor, without the written order
of his parent, guardian, or family physician, or to any person
intoxicated or who is in the habit of getting intoxicated, shall,
for each offense, be fined not less than twenty dollars nor
more than one hundred dollars, and imprisoned in the
county jail not less than ten nor more than thirty days."

The previous sections define: 1. Dram shops; 2. Pro-
vides penalty for selling without license; 3. How license
may be granted; 4. The form of the license, the rights under
it, and how revoked for violation of the provisions of the act,
or by keeping a disorderly or ill-governed house, or place of
resort for idle or dissolute persons, or by allowing any illegal
gaming in the dram shop, or in any house or place adjacent
thereto; 5. Provides for taking bond of the dram seller, and
how suit may be brought thereon.

This statute is highly penal in its provisions, and is em-
phatically a penal statute, and, according to well recognized
canons, must be construed strictly, keeping in view the great
central object the legislature had in view in its enactment,
and the evils to be prevented. The title of the act, in the
revision of 1874, is "Dram Shops," and every section is
leveled against them, with a view not to their suppression,
for they are licensed to sell intoxicating liquors, and pay large
sums of money into the town or county treasury for the privi-
lege. The provisions of the act are aimed at such. What,
then, under this view of the statute, should be the construc-
tion to be put on the sixth section? Can it be, should it be,
other than this: that whoever, keeping a dram shop, shall,
etc.?

The leading facts in this case are: that the defendant was
the owner and operator of a brewery, selling the manufacture
by the keg or barrel to any one who wished to purchase, and
for the privilege he became liable to pay to the government
of the United States large sums of money, demanded by the
internal revenue laws, to be appropriated to the payment of

our government debt.   He kept no dram shop, nor did he
sell his beverage by the small, to be drank on his premises. ,

One day, about the last of July or first of August, 1874,
Charles Dewey, the person to whom it is alleged defendant
sold or gave one or more glasses of beer, came to see defend-
ant, who was then in bad  health and nearly blind, lying on
a lounge in his house, apart from his brewery, for the purpose
of getting a renewal of a lease of some lots at Ohio station,
on which he had erected a hay press.   He was accompanied
by Mr. Kyle, an attorney at law, who was wanted by Dewey
to draw the papers.   When Dewey and Kyle reached the
house, and found defendant in this condition, they also found
Andrew Ross there, and Samuel Connor, the principal wit-
nesses for the prosecution.   Ross' business there, he being a
preacher, was to aid Connor in purchasing some lots of de-
fendant, and to see about the two lots on which Dewey had
his hay press, for the purpose of building a mill upon them.
Ross had talked about this with defendant, when Kyle and
Dewey came in.   Dewey wanted to buy the lots, as it would
be expensive to move his press, which had cost him eighteen
hundred dollars.   Ross, in his testimony, says, he supposes
Dewey thought he was trying to get these lots, and he got
mad, and talked pretty loud, and was "a little boozy."   Con-
nor, on his cross-examination, says, he wanted to buy some
lots; Kyle and Dewey came in and went off together; Dewey
was considerably excited; he thought he would lose consid-
erable in moving his press, and was much excited at Ross.
On his direct examination he says, Dewey seemed a little
tight—was intoxicated; called for beer twice; some person
went into another room and brought it out, and set the beer
and glasses on the table, and all were invited to partake.
Ross being a preacher, of course declined, never having drank
intoxicating liquors.   Connor never drank anything intoxi-
cating, and never was drunk.

The opposing testimony of Kyle, Dewey and defendant,
shows quite conclusively Dewey was not intoxicated; that

the beer was sent for to the brewery, and proffered by defendant to his visitors as an act of hospitality to neighbors and friends. Surely, it was not such an act as this the statute in question was intended to punish by imprisonment in the county jail. It has nothing of the odor of a dram shop about it, and was but a mere courtesy, which this law was not designed to reach.

If one invites his friends to dine with him, and generous wine, which cheers the heart, is pressed upon the guests, one of whom happened to be excited with wine when he came there, is the host to be incarcerated for giving to this most bibulous guest an additional glass? We do not think the statute should bear such a construction. The culture of the grape is recommended by the moralist and the economist, and the expression of its juices into wine. Would it be held an offense, punishable by fine and imprisonment, should the vintner, from his wine press, fill a flagon and serve it to his guests in his own house, at his table? Where is the difference in a brewer presenting a tankard under similar circumstances? We can not believe this law was designed to punish such acts.

The testimony, we think, is quite sufficient to show, Dewey, though highly excited at what he believed to be the interference of Ross to get these lots, was not intoxicated. He swears positively he had drank, during the day and before dinner, but three or four glasses of beer, and that he was not intoxicated in the slightest degree. There is not the slightest proof Dewey was in the habit of getting intoxicated.

A jury was waived in this case, and we think the finding of the court was against the clear preponderance of the evidence, and the case made was not one contemplated by the sixth section of chap. 43, title "Dram Shops."

The judgment must be reversed.

*Judgment reversed.*